FILED

2023 Feb-09  PM 04:56
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLES C. MARTIN, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO: |
| | ) | 2023- |
| | ) | JURY DEMAND |
| THE ALABAMA GREAT | ) | |
| SOUTHERN RAILROAD | ) | |
| COMPANY; NORFOLK | ) | |
| SOUTHERN RAILWAY | ) | |
| COMPANY; and NORFOLK | ) | |
| SOUTHERN CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

# COMPLAINT

## I.   INTRODUCTION

1.   This is an action alleging age discrimination and retaliation in violation of the Act of Congress known as "the Age Discrimination in Employment Act," 29 U.S.C. §621 *et seq.*, which provides for injunctive and other relief against age discrimination brought by Plaintiff against Defendants.

2.   Plaintiff seeks injunctive relief, equitable relief, compensatory, nominal, liquidated damages, and reasonable attorney fees and costs for his claims of age discrimination and retaliation in his employment.

## II.   JURISDICTION

3.    This Court has jurisdiction in accordance with 28 U.S.C. §1331 and 38 §U.S.C. §4323(b). Venue is proper pursuant to 28 §U.S.C. 1391.

4.    Plaintiff has fulfilled all conditions precedent to the institution of this action under the ADEA.  Plaintiff timely filed his charge of discrimination within 180 days of the occurrence of the last discriminatory act, specifically on or about June 18, 2021 (attached as Exhibit "A" hereto).  On or about November 18, 2022, after investigating the claim, the Equal Employment Opportunity Commission issued a Determination and Notice of Rights (attached hereto as Exhibit "B").  Plaintiff timely filed this lawsuit within 90 days of his receipt of the Notice of Right to Sue.

## III.   PARTIES

4.    Plaintiff, Charles C. Martin, III, is an individual over the age of 19 years and a resident of Bailey, Lauderdale County, Mississippi.  At all times during his employment, Plaintiff was qualified to perform his job duties and responsibilities with Defendants.

5.    Defendant, The Alabama Great Southern Railroad Company ("AGSRC"), is an "employer" as defined under the Act of Congress known as "the Age Discrimination in Employment Act," and is subject to compliance under these statutes.  42 U.S.C. §12111(5); 29 §U.S.C. 2611(4); 29 U.S.C. §621 *et seq.*

2

6.     Defendant AGSRC is a Norfolk Southern subsidiary that operates between Birmingham and New Orleans. Defendant AGSRC is an Alabama corporation. During Plaintiff's employment, he worked on said line.

7.     Defendant, Norfolk Southern Railway Company, is an "employer" as defined under "the Age Discrimination in Employment Act," and is subject to compliance under these statutes.  42 U.S.C. §12111(5); 29 §U.S.C. 2611(4); 29 U.S.C. §621 *et seq*.  Defendant is a Norfolk, Virginia-based company that does business in Birmingham, Jefferson County, Alabama.

8.     Defendant, Norfolk Southern Corporation, is an "employer" as defined under "the Age Discrimination in Employment Act," and is subject to compliance under these statutes.  42 U.S.C. §12111(5); 29 §U.S.C. 2611(4); 29 U.S.C. §621 *et seq*.  Defendant is a Norfolk, Virginia-based company that does business in Birmingham, Jefferson County, Alabama.

9.     Defendants AGSRC, Norfolk Southern Railway Company and Norfolk Southern Corporation were a "railroad carrier" within the meaning of 49 U.S.C. §20109.

## IV.  FACTUAL ALLEGATIONS

10.     Plaintiff re-alleges and incorporates by reference the foregoing paragraphs above with the same force and effect as if fully set out in specific detail herein below.

3

11.   Plaintiff is 67 years old.

12.   From May 1979 until being discriminatorily pulled out of service/removed from service, on January 14, 2021, Plaintiff worked as a trainman and conductor for The Alabama Great Southern Railway Company. The Alabama Great Southern is the Norfolk Southern subsidiary that operates trains on the mainline running from New Orleans, Louisiana, to Chattanooga, Tennessee.

13.   The Alabama Great Southern operates a railroad yard in Meridian, Mississippi, and was Plaintiff's home terminal throughout his career.

14.   Plaintiff was the oldest trainman/conductor on the seniority roster for her territory. Before being removed from service, Plaintiff was the only remaining employee who received annual productivity agreement payments from Fund Number 62.

15.   For most of the last several years, Plaintiff worked as a utility man helping switching crews. However, Defendants eliminated that position on December 24, 2020, so Plaintiff exercised his seniority to become the conductor on the A01 job, which is one of the switching crews that he had worked with as the utility man. Plaintiff worked as the conductor on the A01 from December 28, 2020, to January 14, 2021. Predictably, working the A01 without a utility man resulted in some drop off in productivity and some cars were not getting switched during the time that the railroad allowed work to be done. Defendants knew that the A01 crew

could not complete all of the work being assigned without a utility man. Yardmaster Brian Sharp repeatedly said that he knew that they could not finish all of the yard work that he gave them but to "do the best you can."

16.    On January 12 or 13, 2021, a female trainmaster from New Orleans came to Meridian and watched Plaintiff work. She watched Plaintiff for most of the day but never spoke to him. A yardmaster told the plaintiff that she was there just to watch him. However, Plaintiff did not notice any other employees being "watched."

17.    On January 14, 2021, Superintendent Hill from New Orleans came to Meridian to again watch the plaintiff. Superintendent Hill approached the plaintiff without introducing himself and said, "you look like you're struggling" to which the plaintiff responded that "no, I'm fine." Superintendent Hill walked off and soon after the plaintiff received a radio message from the yardmaster telling him to report to the yard office to speak with Superintendent Hill. When the plaintiff arrived at the yard office, Superintendent Hill ushered him into an office. "How old are you?" were the first words he spoke after the office door closed. Plaintiff told him that he was 64 years old and would be 65 in a few days. Next, Superintendent Hill asked how many years the plaintiff had worked on the railroad. When the plaintiff stated 42 years, Superintendent Hill asked, "why haven't you retired?" Plaintiff answered that he was not ready to retire.

18.    Next, Superintendent Hill accused Plaintiff of struggling to step over tracks and said that he would have ridden the side of the railcar being switched out "when you were younger." Again, Plaintiff told him that he was not struggling to do his job.  Superintendent Hill responded that he was pulling the plaintiff out of service.  He said that he would not feel comfortable returning to New Orleans with the plaintiff still working and couldn't live with himself if the plaintiff's "long 42-year career" ended with him being injured on the job.  Superintendent Hill further said that Plaintiff would be contacted by the Medical Department.

19.    Plaintiff was told, after being removed from service, Superintendent Hill went to look at some switches that the plaintiff had reported for being hard to throw and needing maintenance.  Defendants trained the plaintiff to report hard to throw switches to protect against employees getting hurt.  In accordance with this training, the plaintiff, throughout his career, reported switches that were becoming hard to throw.  Specifically, Plaintiff had reported some switches as hard to throw during the days and weeks immediately before being removed from service.

20.    Plaintiff was surprised to be pulled out of service and to have his fitness to perform the railroad duties questioned.  Plaintiff performed these duties for over four decades.  Plaintiff worked out three days a week at a gym using both exercise machines and free weights.  Plaintiff can push up 130 pounds with each arm and can easily bench press 200 pounds.  Plaintiff's fitness has never been questioned.

21.     Since being discriminatorily removed from his position due to his age, Plaintiff has diligently pursued reinstatement. These efforts began on January 15th, the day after being pulled out of service, when the plaintiff called Defendants' Medical Department and left a message asking what he needed to do to get back to work. Plaintiff then made an appointment to see his primary care physician. By the time that Plaintiff finally spoke to someone from the Norfolk Southern Medical Department about a week later, he had already been to his primary care physician for a fitness examination and had received a note confirming his fitness to work his railroad job with no restrictions. When Plaintiff mentioned this to Ms. Johnson from the medical department, she asked him to send her the doctor's note, which he did, via fax, that day. Ms. Johnson said she would let the plaintiff know if she needed anything more from him and if she didn't, that he would be hearing from a supervisor.

22.     On January 25, 2021, Ms. Johnson informed Plaintiff that the Medical Department had cleared him to return to work and that his supervisor had been advised of that fact. The following day, Ms. Johnson confirmed that Superintendent Hill was the supervisor who she advised that the plaintiff was clear to return to work by the Medical Department.

23.     After the Medical Department cleared Plaintiff to return to work, he expected to be reinstated but wasn't. Instead, Plaintiff was required to undergo a

"work evaluation" on February 4, 2021. The evaluation was directed by Greg Porter, who said that he was a training coordinator. Plaintiff is unsure if Mr. Porter was qualified to administer functional capacity evaluations as he worked as a welder, security guard and utility worker. Plaintiff was not shown any medical education, training, certification, or license by Mr. Porter.

24.    However, Mr. Porter put Plaintiff through a series of tasks that included: climbing on and off a boxcar; climbing on one side of a boxcar, crossing the end platform, and climbing down on the other side; climbing onto a boxcar to release the hand brake and then climbing down; climbing onto a boxcar to apply the hand brake and then climbing down; buckling and unbuckling air hoses between equipment; operating a switch in each direction; climbing onto and into a locomotive and then climbing down; and, walking about 1,000 feet on a ballast walkway. Before each task, Mr. Porter gave Plaintiff a time limit in which to complete it. After Plaintiff completed each task, Porter told him how long it had taken him to do so. Plaintiff easily performed all of the tasks under the time limits given. Trainmaster Jake Noe and Marquis Sillimon, Plaintiff's union representative, watched the entire assessment, which took less than an hour.

25.    Marquis Sillimon confirmed that the plaintiff completed every task within the activity time requirements, within the rules and without difficulty.

26.    In the many years that the plaintiff worked for Defendant, he has never known of an employee being withheld from service after the Medical Department cleared him for duty, nor have he ever known of an employee whose been cleared the Medical Department having to undergo a work evaluation to get back to work.

27.    On the day after completing the work evaluation, Plaintiff called the Norfolk Southern Ethics Hotline to ask for help getting back to work and spoke to Steve Weatherman.  He said that he would refer the matter to Norfolk Southern EEOC Department.

28.    On or about February 9, 2021, Superintendent Hill told Plaintiff's local union representative that he would be hearing soon from the Norfolk Southern Medical Department.  In late February, the Norfolk Southern Medical Department sent paperwork to the plaintiff's primary care physician who had already noted that he was physically fit to work without restrictions.

29.    On March 1, 2021, Norfolk Southern Chief Medical Officer, Natalie Hartenbaum, informed the plaintiff that she would accept the first work release from his doctor and would be talking to his supervisor.

30.    Not long after Dr. Hartenbaum told the plaintiff that she was accepting the work release note from his primary care doctor, Norfolk Southern sent paperwork for the plaintiff's cardiologist to fill out. So, Plaintiff went to see the cardiologist and underwent testing that included an echocardiogram, a carotid artery

test and a nuclear test. The cardiologist reported that everything was normal and said that was exactly what he expected. The cardiologist showed the plaintiff that Defendant had reported to him that he (plaintiff) was fatigued from throwing a switch during the work evaluation, which was not true.

31.     When Plaintiff called Teresa Mack with the Medical Department, on April 8, 2021, to ask about his returning to work status, she informed him that the Medical Department had released him on April 6, 2021 and told the plaintiff to call his supervisor. This is at least the third time that the Medical Department told the plaintiff that he was cleared to return to work.

32.     In following Ms. Mack's instruction, Plaintiff called his trainmaster and left a message asking him to call him. The trainmaster responded on April 12, 2021, that he was waiting on the Medical Department. When Plaintiff spoke to Ms. Mack at the Medical Department a couple of days later, she confirmed that she had told the plaintiff's trainmaster that he was cleared to return to work.

33.     On April 21, 2021, Plaintiff was sent a letter by his trainmaster stating:

> *I have received notification from the Chief Medical Officer that the fitness for duty concerns previously identified may not be due to a medical condition. As such please contact me at 205-790-1348 within (5) days from the date of this letter to make arrangements to markup which will include the need to successfully complete a fitness for duty evaluation.*
>
> *Failure to follow these instructions may result in disciplinary handling.*

34.    Plaintiff complied with the letter's directive by contacting the trainmaster, and, on April 29, 2021, Plaintiff underwent a second work evaluation.

35.    This second evaluation was directed by Steve Guinn, who identified himself as a training coordinator for new hires. The second evaluation was more physically demanding than the first and consisted of: walking 4,000 feet; crossing over two trains on adjacent tracks; manually applying and releasing the handbrakes on six different railcars; coupling air hoses between 20 railcars; hanging on the side of a boxcar for one minute; throwing three switches; picking up and carrying 85-pound knuckle 50 feet; removing and reinstalling a railcar knuckle. The evaluation lasted approximately one hour without breaks or water. Again, Plaintiff completed the evaluation without any problem. The only comment that Mr. Guinn made about the plaintiff's performance was that he skipped a ladder rung as he descended from the brake platform to the sill step after operating a handbrake.

36.    It should be noted that (to make the evaluation more demanding) Mr. Guinn refused to allow the plaintiff to use a brakestick, which is the approved method for applying and releasing handbrakes, in order to make the task more demanding. Using a brakestick keeps the employee from having to climb on and off railcars to operate handbrakes.

37.    On May 13, 2021, Mr. Guinn sent Plaintiff a letter that stated:

*On April 29, 20121 you participated in a fitness for duty evaluation in Meridian, Mississippi. The evaluation was performed by Senior Road Manager J. Noe and me. Your local Representative, M. Sillimon, was also in attendance to observe the evaluation on your behalf.*

*The evaluation began at 10:00 AM (CT) and you performed eight conductor specific tasks in sequence. Unfortunately, based on our observations you did not successfully pass the evaluation. As a result, you have been currently deemed unfit to safely perform the role of conductor and have been shown in a "held off pending" status. However, should your ability to safely perform your role improve, once you feel you can safely and successfully pass the fitness for duty evaluation, please contact Senior Road Manager Noe at 205-790-1348 to schedule another fitness for duty evaluation. Upon your successful completion of a fitness for duty evaluation we will initiate the return to work process.*

*If you wish to be considered for employment in another vacant position for which you qualify and can work safely, please contact Vocational Rehabilitation Services at 1-800-552-2306 ext. 6645047, FAX 757-823-8951 or VRS@nscorp.com.*

*We hope that your ability to safely perform your duties improves, and you will be able to return to work in your present job. If you have any questions, please feel free to contact me.*

38.     Since taking Plaintiff out of work, Defendants have been trying to force him into retirement by not reinstating him. According to the Medical Department, Plaintiff was cleared for full duty without restrictions, yet he has not been allowed to return to work. Plaintiff could not and cannot draw short-term disability benefits because the Medical Department says that he is/was able to be working his job.

39.     Defendants further refused to show the plaintiff the results of the work evaluations and has never told him what impairment they believe he has. The assertions that Plaintiff did not successfully complete the work evaluations are falsehoods designed to justify ongoing harassment and discrimination. Again, Marquis Sillimon, union representative, was present for both evaluations, which Plaintiff passed.

40.     Defendants also cancelled Plaintiff's insurance that he received as a fringe benefit of employment. Plaintiff was further told by Jason Roberts, union representative, that the insurance would not be reinstated because there was not a medical hold on him.

41.     Plaintiff has been out of work for two years without income or insurance due to Defendants' discriminatory treatment. Plaintiff is able to perform his job duties and responsibilities and has been cleared to return to work.

42.     Through the actions and inactions described above, Defendants discriminated and retaliated against Plaintiff by removing him from service, refusing to reinstate his employment, thereby terminating his employment based on his age.

43.     Defendants unlawfully removed Plaintiff from his job thereby terminating his employment.

44.     Because of such conduct, Plaintiff has suffered emotional distress, embarrassment, and humiliation.

45.     Defendants' actions were willful, with malice and with reckless disregard for Plaintiff's rights.

## V.     CAUSES OF ACTION

### COUNT I - AGE DISCRIMINATION

46.     Plaintiff re-alleges and incorporates by reference paragraphs 1-45 above with the same force and effects as if fully set out in specific detail herein below.   This Count addresses those claims seeking to redress the unlawful employment practice of age discrimination conducted by Defendants' agents and employees and ratified by Defendants and protected by federal law that prohibits age discrimination.

47.     This is an action to redress grievances resulting from acts of Defendants, their agents, managers, and employees committed with respect to Plaintiff's employment and for a permanent injunction restraining Defendants from

maintaining a policy and practice of discriminating against the Plaintiff and other persons similarly situated on account of age.

48. Plaintiff is 67 years of age and a member of a protected group.

49. Plaintiff was subjected to discriminatory treatment by Defendants and was terminated because of his age.

50. As described above, Defendants have a pattern and practice of discrimination against older employees. Plaintiff's allegations, as set forth above, present a convincing mosaic of circumstantial evidence which supports a finding of intentional age discrimination.

51. Plaintiff was directly affected by the discriminatory practices described in this Complaint and as a result of his age was terminated by Defendants.

52. The systemic discrimination, as previously set forth, further adversely affected Plaintiff by promoting and reinforcing age bias in the workplace.

53. Defendants intentionally and maliciously discriminated against the Plaintiff by treating him differently in the terms and conditions of his employment and by discriminatorily terminating him. All of this conduct was in violation of ADEA.

54. As a proximate result of Defendants' unlawful intentional discrimination, Plaintiff suffered different treatment than younger employees and was deprived of income and other benefits due to him.

55.     Plaintiff seeks declaratory and injunctive relief, reinstatement, award of lost employment benefits and wages, back pay, front pay, interest, liquidated damages, costs, attorneys' fees, and any and all other such relief the trier of fact may assess.

56.     Plaintiff has no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and this suit for a declaratory judgment, back-pay, an injunction, and compensatory damages is his only means of securing adequate relief.

57.     Plaintiff is suffering and will continue to suffer irreparable injury from the Defendants' unlawful conduct in violation of ADEA as set forth herein unless enjoined by this Court.

## COUNT II - RETALIATION PURSUANT TO THE ADEA

58.     Plaintiff re-alleges and incorporates by reference the foregoing paragraphs above with the same force and effect as if fully set out in specific detail herein below.

59.     Plaintiff engaged in protected activity by making complaints of age discrimination.

60.     Plaintiff was then unlawfully terminated on January 14, 2021.

61.     Defendants' actions, which happened soon after Plaintiff's complaints, are causally related to Plaintiff's protected activity. Plaintiff was taken off his job and has been denied reinstatement due to his complaints of age discrimination.

62.    Defendants' reason for removing/terminating Plaintiff was pretext for retaliation.

63.    As a result of this retaliatory treatment, Plaintiff suffered damages in the form of lost wages, emotional distress, and other compensatory damages.

64.    Defendants engaged in the practices complained of herein with malice and/or reckless indifference to Plaintiff's federally protected rights.

65.    Plaintiff seeks to redress the wrongs alleged herein and this suit for back-pay plus interest, nominal and compensatory damages, and an injunctive and declaratory judgment is his only means of securing adequate relief.  Plaintiff is now suffering and will continue to suffer irreparable injury from Defendants' unlawful policies and practices as set forth herein unless enjoined by this Court.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.    Issue a declaratory judgment that the employment policies, practices, procedures, conditions, and customs of Defendants, including the action taken against Plaintiff by Defendants, are violative of Plaintiff's rights as secured by the Act of Congress known as "the Age Discrimination in Employment Act," 29 U.S.C. §621 *et seq.*

2.      Grant Plaintiff a permanent injunction enjoining Defendants, its agents, successors, employees, attorneys, and those acting in concert with Defendants, and at Defendants' request, from continuing to violate Plaintiff's rights as well as those who are similarly situated pursuant to the Act of Congress known as "the Age Discrimination in Employment Act," 29 U.S.C. §621 *et seq.*

3.      Award Plaintiff damages including reinstatement and/or front pay, back pay, nominal, compensatory, liquidated damages.

4.      Award Plaintiff reasonable costs, attorney's fees, and expenses.

5.      Award such other relief and benefits as the cause of justice may require.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL TRIABLE CLAIMS**

Respectfully submitted,

Gregory O. Wiggins
WIGGINS, CHILDS, PANTAZIS,
    FISHER & GOLDFARB, L.L.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
(205) 314-0500
gwiggins@wigginschilds.com

F. Tucker Burge, Sr.
F. Tucker Burge, Jr.
Burge & Burge, P.C.
Renasant Place
2001 Park Place, Suite 1350
Birmingham, AL  35203
205-251-9000 (Office)
205-323-0512 (Facsimile)
tucker@burge-law.com
ftbjr@burge-law.com

*Counsel for Plaintiff*

## DEFENDANTS' ADDRESS FOR SERVICE
## VIA CERTIFIED MAIL

The Alabama Great Southern Railroad Company
c/o Registered Agent, Crawford S. McGivaren, Jr.
2001 Park Place North, Suite 700
Birmingham, Alabama 35203

Norfolk Southern Railway Company
c/o Registered Agent, Crawford S. McGivaren, Jr.
2001 Park Place North, Suite 700
Birmingham, Alabama 35203

Norfolk Southern Corporation
c/o Registered Agent, Crawford S. McGivaren, Jr.
2001 Park Place North, Suite 700
Birmingham, Alabama 35203

# *EXHIBIT A*

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 423-2021-00997 |
| ☒ EEOC | |
| | and EEOC |

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) | |
|---|---|---|
| Charles C. Martin, III | | |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | DATE OF BIRTH |
| | | ▓▓▓/56 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| The Alabama Great Southern Railway Company | over 100 | 601/484-47053102 |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | COUNTY |
| 3102 3rd Street    Meridian, MS 39301 | | |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| Norfolk Southern Corporation | | |
| STREET ADDRESS    CITY, STATE AND ZIP CODE | | COUNTY |
| 4998 Austell Powder Springs Road    Austell, Georgia 30106 | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| | | | | DATE DISCRIMINATION TOOK PLACE |
|---|---|---|---|---|
| ☐ RACE | ☐ COLOR | ☐ SEX | ☐ RELIGION   ☒ AGE | January 14, 2021 |
| ☒ RETALIATION | ☐ NATIONAL ORIGIN | ☒ DISABILITY | ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

PLEASE SEE ATTACHED PAGE FOR PARTICULARS OF MY CHARGE/CLAIMS

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | *Charles C Martin III* |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
| | (Day, month, and year) |
| Date  6/18/21    *Charles C. Martin III*    Charging Party (Signature) | |

EEOC FORM 5 (10/94)

Page 2
EEOC Charge - Charles C. Martin, III

1.      I am 65 years old with my date of birth being (b)(7)(C) 1956.

2.      From May 1979 until being discriminatorily pulled out of service on January 14, 2021, I worked as a trainman and conductor for The Alabama Great Southern Railway Company. The Alabama Great Southern is the Norfolk Southern subsidiary that operates trains on the mainline running from New Orleans, Louisiana, to Chattanooga, Tennessee. The Alabama Great Southern operates a railroad yard in Meridian, Mississippi, and that has been my home terminal throughout my career. I am the oldest trainman/conductor on the seniority roster for my territory. Before being removed from service, I was the only remaining employee who received annual productivity agreement payments from Fund Number 62..

3.      For most of the last several years, I worked as a utility man helping switching crews. The Respondent eliminated that position on December 24, 2020, so I exercised my seniority to become the conductor on the A01 job, which is one of the switching crews that I had worked with as the utility man. I worked as the conductor on the A01 from December 28, 2020, to January 14, 2021. Predictably, working the A01 without a utility man resulted in some drop off in productivity and some cars were not getting switched during the time that the railroad allowed us to work. The Respondent knew that the A01 crew could not complete all of the work being assigned without a utility man. Yardmaster Brian Sharp repeatedly said that he knew that we could not finish all of the yard work that he gave us but to "do the best you can."

4.      On January 12 or 13, 2021, a female trainmaster from New Orleans came to Meridian and watched me work. She watched me for most of the day but never spoke to me. A yardmaster told me that she was there just to watch me.

5.      On January 14, 2021, Superintendent Hill from New Orleans came to Meridian to watch me. He approached me without introducing himself and said "you look like you're struggling" to which I responded that "no, I'm fine." He walked off and soon after I received a radio message from the yardmaster telling me to report to the yard office to speak with Superintendent Hill. When I arrived, Superintendent Hill ushered me into an office. "How old are you?" were the first words he spoke after the office door closed. I told him that I was 64 years old and would be 65 in a few days. Next, Superintendent Hill asked how many years had I worked on the railroad. When I said 42 years, Superintendent Hill asked "why haven't you retired?" I answered that I'm not ready to retire. Next, Superintendent Hill accused me of struggling to step over tracks and said that I would have ridden the side of the railcar being switched out "when you were younger." Again, I told him that I am not struggling to do my job. Superintendent Hill responded that he was pulling me out of service. He said that he would not feel comfortable returning to New Orleans with me still working and couldn't live with himself if my "long 42-year career" ended with me being injured on the job. Superintendent Hill said that I would be contacted by the Medical Department.

6.      I've been told that after removing me from service, Superintendent Hill went to look at some switches that I had reported for being hard to throw and needing maintenance. The Respondent trained me to report hard to throw switches to protect against employees getting hurt. In accordance with this training, I have reported switches that are becoming hard to throw throughout my career.

Page 3
EEOC Charge - Charles C. Martin, III

7.    I was surprised to be pulled out of service and to have my fitness to perform the railroad duties questioned. I have performed these duties for over four decades. I work out three days a week at a gym using both exercise machines and free weights. I can push up 130 pounds with each arm and can easily bench press 200 pounds.

8.    I have diligently pursued reinstatement. These efforts began on January 15th, the day after being pulled out of service, when I called the Respondent's Medical Department and left a message asking what I needed to do to get back to work. Then I made an appointment to see my primary care physician. By the time that I finally spoke to someone from the Norfolk Southern Medical Department about a week later, I had already been to my primary care physician for a fitness examination and had received a note confirming my fitness to work my railroad job with no restrictions. When I mentioned this to Ms. Johnson from the medical department, she asked me to send her the doctor's note, which I did, via fax, that day. Ms. Johnson said she would let me know if she needed anything more from me and if she didn't, that I would be hearing from a supervisor.

9.    On January 25th, Ms. Johnson told me that the Medical Department had cleared me to return to work and that my supervisor had been advised of that fact. The following day, Ms. Johnson confirmed that Superintendent Hill was the supervisor who she advised that I was clear to return to work by the Medical Department.

10.    After the Medical Department cleared me to return to work, I expected to be reinstated but wasn't. Instead, I was required to undergo a "work evaluation" on February 4. The evaluation was directed by Greg Porter, who said that he was a training coordinator. He put me through a series of tasks that included: climbing on and off a boxcar; climbing on one side of a boxcar, crossing the end platform, and climbing down on the other side; climbing onto a boxcar to release the hand brake and then climbing down; climbing onto a boxcar to apply the hand brake and then climbing down; buckling and unbuckling airhoses between equipment; operating a switch in each direction; climbing onto and into a locomotive and then climbing down; and, walking about 1,000 feet on a ballast walkway. Before each task, Mr. Porter gave me a time limit in which to complete it. After I completed each task, he told me how long it had taken me to do so. I easily performed all of the tasks under the time limits given.  Trainmaster Jake Noe and Mark Silimon, my union representative, watched the entire assessment which took less than an hour.

11.    In the many years that I have worked for the Respondent,, I have never known of an employee being withheld from service after the Medical Department cleared him for duty, nor have I ever known of an employee whose been cleared the Medical Department having to undergo a work evaluation to get back to work. On the day after completing the work evaluation, I called the Norfolk Southern Ethics Hotline to ask for help getting back to work and spoke to Steve Weatherman. He said that he would refer the matter to Norfolk Southern's EEOC.

12.    On or about February 9th, Superintendent Hill told my local union representative that I would be hearing soon from the Norfolk Southern Medical Department. In late February, the Norfolk Southern Medical Department sent paperwork to my primary care physician who had already noted that I was physically fit to work without restrictions. On March 1st, Norfolk Southern's Chief Medical Officer, Natalie Hartenbaum, told me that she would accept the first work release from my doctor and would be talking to my supervisor.

Page 4
EEOC Charge - Charles C. Martin, III

13.     Not long after Dr. Hartenbaum told me that she was accepting the work release note from my primary care doctor, Norfolk Southern sent paperwork for my cardiologist to fill out. So I went to see the cardiologist and underwent testing that included an echocardiogram, a carotid artery test and a nuclear test. The cardiologist reported that everything was normal and said that was exactly what he expected. The cardiologist showed me that the Respondent had reported to him that I was fatigued from throwing a switch during the work evaluation, which isn't true.

14.     When I called Teresa Mack with the Medical Department, on April 8th, to ask about my status, she informed me that the Medical Department had released me on April 6th, and told me to call my supervisor. This is at least the third time that the Medical Department has told me that I was cleared to return to work. In following Ms. Mack's instruction, I called my trainmaster and left a message asking him to call me. The trainmaster responded on April 12th that he was waiting on the Medical Department. When I spoke to Ms. Mack at the Medical Department a couple of days later, she confirmed that she had told my trainmaster that I was cleared to return to work.

15.     On April 21st, my trainmaster sent me a letter stating:

*I have received notification from the Chief Medical Officer that the fitness for duty concerns previously identified may not be due to a medical condition. As such please contact me at 205-790-1348 within (5) days from the date of this letter to make arrangements to markup which will include the need to successfully complete a fitness for duty evaluation.*

*Failure to follow these instructions may result in disciplinary handling.*

16.     I complied with the letter's directive by contacting the trainmaster, and, on April 29th, I underwent a second work evaluation. This second evaluation was directed by Steve Guinn, who identified himself as a training coordinator for new hires. The second evaluation was more physically demanding than the first and consisted of: walking 4,000 feet; crossing over two trains on adjacent tracks; manually applying and releasing the handbrakes on six different railcars; coupling airhoses between 20 railcars; hanging on the side of a boxcar for one minute; throwing three switches; picking up and carrying an 85 pound knuckle 50 feet; removing and reinstalling a railcar knuckle. The evaluation lasted approximately one hour without breaks or water. Again, I completed the evaluation without any problem. The only comment that Mr. Guinn made about my performance was that I skipped a ladder rung as I descended from the brake platform to the sill step after operating a handbrake. It should be noted that (to make the evaluation more demanding) Mr. Guinn refused to allow me to use a brakestick, which is the approved method for applying and releasing handbrakes, in order to make the task more demanding. Using a brakestick keeps the employee from having to climb on and off railcars to operate handbrakes.

Page 5
EEOC Charge - Charles C. Martin, III

17.   On May 13th, Mr. Guinn sent me a letter that states as follows:

*On April 29, 20121 you participated in a fitness for duty evaluation in Meridian, Mississippi. The evaluation was performed by Senior Road Manager J. Noe and me. Your local Representative, M. Sillimon, was also in attendance to observe the evaluation on your behalf.*

*The evaluation began at 10:00 AM (CT) and you performed eight conductor specific tasks in sequence.  Unfortunately, based on our observations you did not successfully pass the evaluation. As a result, you have been currently deemed unfit to safely perform the role of conductor and have been shown in a "held off pending" status. However, should your ability to safely perform your role improve, once you feel you can safely and successfully pass the fitness for duty evaluation please contact Senior Road Manager Noe at 205-790-1348 to schedule another fitness for duty evaluation. Upon your successful completion of a fitness for duty evaluation we will initiate the return to work process.*

*If you wish to be considered for employment in another vacant position for which you qualify and can work safely, please contact Vocational Rehabilitation Services at 1-800-552-2306 ext. 6645047, FAX 757-823-8951 or VRS@nscorp.com.*

*We hope that your ability to safely perform your duties improves, and you will be able to return to work in your present job. If you have any questions, please feel free to contact me.*

18.   The Respondent is trying to force me into retirement by not reinstating me.  According to the Medical Department, I am cleared for full duty without restrictions, yet I am not allowed to return to work.  I cannot draw short-term disability benefits because the Medical Department says that I am able to be working my job. The Respondent refuses to let me see the results of the work evaluations and has never told me what impairment it regards me as having. The assertions that I did not successfully complete the work evaluations are falsehoods  designed  to  justify  ongoing  harassment  and  discrimination.  Marquis  Sillimon,  my  union representative, was present for both evaluations, which I passed.

19.   On information and belief, I believe that I am and have been discriminated against because of my age, my perceived disabilities, and in retaliation for engaging in protective activity (continuous complaints regarding my removal from service) in regards to removal from my job duties and responsibilities, failure to recall and/or reinstate to my job duties and responsibilities, being forced to undergo numerous fitness evaluations, pay, benefits, and other terms and conditions of employment in violation of Title IV of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981, Title I and II of the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* ("§504").

Charles C. Martin, III

Charles C. Martin, III

6/18/21

Date

# EXHIBIT B



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Mobile Local Office
63 South Royal Street, Suite 504
Mobile, AL 36602
(251) 304-7920
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

**To:** Mr. Charles C. Martin III

Charge No: 423-2021-00997

EEOC Representative and email:     LANEETRA HARRIS
Investigator
laneetra.harris@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 423-2021-00997.

On behalf of the Commission

Digitally signed by Erika LaCour
**Erika LaCour** Date: 2022.11.18 10:42:47 -06'00'

Erika LaCour
Director

cc:
Ricky  Morris
NORFOLK SOUTHERN RAILWAY COMPANY
650 W PEACHTREE ST NW
Atlanta, GA 30308

Gregory O Wiggins
WIGGINS, CHILDS, PANTAZIS, FISHER, GOLDFARB
301 19th St., North
Birmingham, AL 35203


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 423-2021-00997 to the District Director at Bradley Anderson, 1130 22nd Street South Suite 2000 Birmingham, AL 35205.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.
- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months.**

Enclosure with EEOC Notice of Closure and Rights (01/22)

## "Regarded as" coverage

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.*